Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Jennifer Abreu, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees
Insurance Company, GEICO Indemnity Company,
GEICO General Insurance Company and
GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,                                    Docket No.: _____(      )

                              Plaintiffs,

           -against-

AV CHEMISTS LLC,  DENNIS NEKTALOV, VADIM
DOLSKY, AND JOHN DOE NOS. "1" THROUGH "5",

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants AV Chemists LLC ("AV Chemists"),

Dennis Nektalov ("Nektalov"), Vadim Dolsky ("Dolsky") and John Doe Nos. "1" through "5" (the

"John Doe Defendants") (collectively, the "Defendants"), hereby allege as follows:

1.      GEICO brings this action to terminate an ongoing fraudulent scheme perpetrated

by the Defendants who exploited the New York "No-Fault" insurance system by submitting more

than $6.6 million in fraudulent pharmaceutical claims. The Defendants' scheme primarily targeted expensive topical prescription drug products and an exorbitantly priced pain reliever medication, which they systematically dispensed to individuals involved in automobile accidents without regard for genuine patient care.  As part of the fraudulent scheme and to maximize their profits, the Defendants engaged in illegal, collusive relationships to steer large volumes of medically unnecessary and often invalid and/or unauthorized prescriptions, including numerous alleged "telephone" prescriptions, to AV Chemists.

2.        AV Chemists purports to be a neighborhood pharmacy operating in Queens, New York, but in fact, has been used by Defendants Nektalov and Dolsky, along with John Doe Defendants, as part of a large scale fraud scheme to exploit patients for financial gain by overwhelmingly targeting Lidocaine 5% Ointment and Lidocaine 5% Patches (together, the "Fraudulent Topical Pain Products") and Naproxen-Esomeprazole tablets (the "Vimovo Products") with charges often exceeding $2,000.00 per single prescription, along with certain other prescription drug medications (collectively, the "Fraudulent Pharmaceuticals").  The Fraudulent Pharmaceuticals were dispensed pursuant to predetermined protocols to individuals involved in automobile accidents and eligible for insurance coverage under policies of insurance issued by GEICO (the "Insureds").

3.        The fraudulent scheme began in 2019 when Defendants Nektalov and Dolsky partnered with individuals regularly involved in No-Fault insurance fraud to facilitate large volumes of fraudulent pharmaceutical claims that could be billed to GEICO and other New York automobile companies. As part of the fraudulent scheme, the Defendants engaged in collusive financial arrangements with various prescribing healthcare providers (the "Prescribers") and unlicensed laypersons (the "Clinic Controllers") who work at or are associated with various

multidisciplinary medical clinics that almost exclusively treat No-Fault patients (the "No-Fault Clinics"), in order to direct large volumes of prescriptions – or purported prescriptions – for the Fraudulent Pharmaceuticals to AV Chemists.  The purported prescriptions included large volumes of alleged telephone orders to the pharmacy, despite the requirement under New York State law that prescriptions be transmitted electronically to combat the problem of prescription fraud.  In some instances, the purported prescriptions also included electronic prescriptions that failed to comply with New York State law yet were used by AV Chemists as the basis to dispense and bill for the Fraudulent Pharmaceuticals.

4.      As result of their collusive arrangements with the Prescribers and Clinic Controllers, the Defendants submitted an enormous volume of fraudulent billing under the name of AV Chemists – including more than $5.3 million for the targeted Fraudulent Topical Pain Products and Vimovo Products.  The Defendants intentionally targeted the Fraudulent Topical Pain Products and Vimovo Products to dispense to Insureds, in place of other effective but much-less costly prescription and non-prescription drug products, solely based on the medications' exorbitant pricing and high profit margins.  In fact, more than 80% of the billing submitted through AV Chemists was for the Fraudulent Topical Pain Products and Vimovo Products, with charges typically amounting to $2,149.64 per prescription of Vimovo Products; from $725.00 to $1,565.44 per prescription of Lidocaine 5% Ointment; and from $229.64 to $454.28 per prescription of Lidocaine 5% Patches.

5.      By this action, GEICO seeks to recover approximately $596,000.00 that the Defendants stole from it, along with a declaration that GEICO is not legally obligated to pay reimbursement to AV Chemists of approximately $5.2 million in pending fraudulent No-Fault

claims for the Fraudulent Pharmaceuticals that the Defendants submitted or caused to be submitted

through AV Chemists because:

(i)     the Defendants billed for Fraudulent Pharmaceuticals that were prescribed
        and dispensed pursuant to predetermined fraudulent protocols designed to
        exploit the patients for financial gain, without regard for genuine patient
        care;

(ii)    the Defendants participated in illegal, collusive relationships in which they
        steered the Prescribers and Clinic Controllers to direct illegal prescriptions
        for the Fraudulent Pharmaceuticals to AV Chemists in exchange for
        unlawful kickbacks and/or other financial consideration;

(iii)   the Defendants intentionally targeted a specific set of pharmaceutical
        products (i.e., the Fraudulent Topical Pain Products and Vimovo Products)
        that they acquired at low cost and had AV Chemists dispense in large
        volumes to Insureds at egregious charges, in place of other effective, less
        costly pharmaceuticals in order to exploit the reimbursement rates set forth
        by 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee Schedule"); and

(iv)    the Defendants made and continue to make false and fraudulent
        misrepresentations to GEICO by submitting or causing to be submitted
        charges for the Fraudulent Pharmaceuticals through AV Chemists pursuant
        to illegal, invalid, duplicitous and/or unauthorized prescriptions.

6.      The Defendants' scheme began in 2019 and continues uninterrupted to the present

day as the Defendants continue to submit, or cause to be submitted, fraudulent claims to GEICO.

Additionally, the Defendants continue to pursue collection on AV Chemists' unpaid fraudulent

claims against GEICO, as well as other New York automobile insurers.

7.      As discussed more fully below, the Defendants at all times have known that: (i) the

billed-for pharmaceutical products were prescribed and dispensed pursuant to predetermined

fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine

patient care; (ii) the Defendants participated in illegal, collusive relationships in which they steered

the Prescribers and Clinic Controllers to direct illegal prescriptions for the Fraudulent

Pharmaceuticals to AV Chemists in exchange for unlawful kickbacks and/or other financial

considerations; (iii) the Defendants exploited the Pharmacy Fee Schedule by intentionally targeting a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products and Vimovo Products) that they acquired at low cost and caused AV Chemists to dispense to Insureds in large volumes at exorbitant charges, in place of other effective, less-costly pharmaceuticals; and (iv) the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted claims for the Fraudulent Pharmaceuticals pursuant to illegal, invalid, duplicitous, and/or unauthorized prescriptions and continue to seek reimbursement on unpaid fraudulent claims.

8.      Based on the foregoing, the Defendants do not have – and have never had – any right to be compensated for the Fraudulent Pharmaceuticals allegedly dispensed to GEICO Insureds. The chart attached hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to date which the Defendants submitted, or caused to be submitted, to GEICO through AV Chemists using the United States mail or through interstate facsimile transmissions seeking reimbursement under New York's No-fault law.

9.      As a result of the Defendants' scheme, GEICO has incurred damages of approximately $596,037.92.

## THE PARTIES

**I.      Plaintiffs**

10.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska

corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

**II.**      **Defendants**

11.      Defendant AV Chemists is a New York limited liability company, formed on or about February 8, 2018, with its principal place of business at 68-28 Myrtle Avenue, Glendale, New York. AV Chemists was registered with the New York State Department of Education, Office of Professions on May 1, 2018.

12.      Defendant Nektalov resides in and is a citizen of New York and is a purported member and co-owner of AV Chemists.

13.      Defendant Dolsky resides in and is a citizen of Puerto Rico and is a purported member and co-owner of AV Chemists.

14.      The John Doe Defendants are individuals and entities, presently not identifiable, who, along with the Defendants, participated in the operation and control of AV Chemists, including facilitating the illegal, collusive agreements with the Prescribers and Clinic Controllers, and who, upon information and belief, reside in and are citizens of New York and/or New Jersey.

**JURISDICTION AND VENUE**

15.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

16.      Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States.

17.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

18.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.     An Overview of New York's No-Fault Laws

19.     GEICO underwrites automobile insurance in the State of New York.

20.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 165 et seq.)(collectively referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

21.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

22.     The No-Fault Laws limit reimbursement for benefits to prescription drugs only. Over-the-counter ("OTC") drugs and products which may be purchased without a prescription are not covered expenses under the No-Fault Laws.

23.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for

necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3"). In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

24.     Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

25.     The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

26.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005) and <u>Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.</u>, 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed providers may practice a profession in New York because of the concern that unlicensed persons are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

27.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information

concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

28.     Pharmacies "may be held liable for medically unnecessary services" submitted to No-Fault insurers similar to other "downstream providers." See Gov't Emples. Ins. Co.  v. Advanced Comp. Lab., L.L.C., 2020 WL 7042648 (E.D.N.Y. 12/1/2020); 2020 U.S. Dist. LEXIS 224868 (E.D.N.Y. 12/1/2020); Gov't Emples. Ins. Co. v. Wellmart RX, Inc., 435 F. Supp. 3d 443 (E.D.N.Y. 2020). See also Long Is. Radiology v. Allstate Ins. Co., 36 A.D.3d 763, 764 (2d Dept. 2007).

## II.     An Overview of Applicable Licensing Laws

29.     Pursuant to New York Education Law § 6808, no person, firm, corporation, or association shall possess drugs, prescriptions or poisons for the purpose of compounding, dispensing, retailing, wholesaling or manufacturing, or shall offer drugs, prescriptions or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer, or outsourcing facility.

30.     Pursuant to 8 N.Y.C.R.R. § 29.1, pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

31.     Similarly, 8 N.Y.C.R.R. § 29.1 prohibits pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

32.     Pursuant to 8 N.Y.C.R.R. § 63.1(7), pharmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed, which review shall include

screening for potential drug therapy problems due to contraindications, therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

33.    New York Education Law § 6810 prohibits pharmacies from dispensing a drug when the prescription form for that drug includes any other drug. Separate prescriptions are required for each drug prescribed and dispensed.

34.    New York Education Law § 6810 prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

35.    New York Education Law § 6512, § 6530(11), (18), and (19), aiding and abetting an unlicensed person to practice a profession, offering any fee or consideration to a third party for the referral of a patient, and permitting any person not authorized to practice medicine to share in the fees for professional services is considered a crime and/or professional misconduct.

36.    New York Education Law § 6530(17) prohibits a physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for financial gain of the licensee or of a third party.

37.    New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

38.    New York Education Law § 6509-a prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting or refunding of a fee in connection with professional care or services related to drugs and/or medications.

39.     Pursuant to New York Education Law § 6808(2)(c), "[t]he names of the owner or owners of a pharmacy shall be conspicuously displayed upon the exterior of such establishment. The names so displayed shall be presumptive evidence of ownership of such pharmacy by such person or persons."

40.     Pursuant to New York Law § 6808(e), every pharmacy shall be under the immediate supervision and management of a licensed pharmacist.

41.     Pursuant to New York Education Law § 6808(e), pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

42.     Pursuant to New York Education Law § 6808(h), "an application for registration as a pharmacy shall be over good moral character."

### III.    The Defendants' Scheme Involving The Fraudulent Pharmaceuticals

#### A.     Overview of the Scheme

43.     Beginning in 2019, and continuing uninterrupted through the present day, the Defendants implemented a fraudulent scheme in which they used AV Chemists to exploit patients for financial gain by billing the New York automobile insurance industry for millions of dollars in inflated charges – which they were not eligible to receive – for the Fraudulent Pharmaceuticals purportedly dispensed to the Insureds.

44.     AV Chemists purports to be a storefront neighborhood pharmacy operating in and catering to the local community in Queens, New York, when in fact, the Defendants used AV Chemists as part of a large-scale fraud scheme that exploited GEICO's Insureds, as well as insureds of other New York automobile insurers, through the prescribing and dispensing of the Fraudulent Pharmaceuticals in a predetermined, protocol fashion, while intentionally ignoring a vast array of other medications readily available at a fraction of the cost.

45.     Unlike legitimate pharmacies dispensing a wide variety of pharmaceutical products, AV Chemists' business targeted a limited set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products and Vimovo Products), which made up the overwhelming majority of claims submitted to GEICO.  Specifically, the Defendants have submitted – to GEICO alone – over $5.3 million in claims for reimbursement for the Fraudulent Topical Pain Products and Vimovo Products, which account for more than 80% of the billing submitted through AV Chemists.

46.     The Defendant chose these products – Lidocaine 5% Ointment, Lidocaine 5% Patches and the Vimovo Products – because they could acquire them at low cost and submit claims for reimbursement to GEICO at exorbitant prices after illegally steering prescriptions to themselves. Moreover, the Defendants knew that similar OTC products that could be recommended to Insureds were not covered under the No-Fault Laws, thus leading the Defendants to target the prescription of the Fraudulent Topical Pain Products and Vimovo Products despite the lack of medical necessity for these particular products.

47.     Not surprisingly, the Office of the Inspector General of the U.S. Department of Health and Human Services noted that Lidocaine and Diclofenac – another topical pharmaceutical Defendants dispensed and billed for through AV Chemists – have been two of the most common products subject to fraud and abuse by pharmacies with questionable billing. See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018).

48.     The remaining billing submitted through AV Chemists was primarily for oral nonsteroidal anti-inflammatory drugs ("NSAIDs") and muscle relaxers submitted as part of the scheme to defraud GEICO.

49.     Nektalov and Dolsky, together with the John Doe Defendants, operate AV Chemists for the sole purpose of effectuating a multimillion-dollar pharmacy fraud scheme.

50.     Initially, Nektalov was the sole member and owner of AV Chemists. Nektalov is not a licensed pharmacist, did not own or operate any other pharmacy prior to becoming the record owner and operator of AV Chemists, and is unfamiliar with New York pharmacy laws and regulations.

51.     Nektalov's prior pharmacy experience was limited to purportedly providing "marketing" services to Valuecare Pharmacy, Inc., which was a named defendant in a federal affirmative fraud litigation captioned State Farm Mut. Auto. Ins. Co. et al. v. Valuecare Pharmacy, Inc. et al., Docket No. 1:18-cv-02414 (PKC)(ST) (E.D.N.Y. 4/24/2018), wherein it was alleged that, among other things, the defendants targeted and dispensed medically unnecessary topical pain products pursuant to illegal financial arrangements.

52.     In order to effectuate the fraudulent scheme, Nektalov entered a business partnership agreement with Dolsky in 2019 and thereafter became co-owners of AV Chemists despite having no knowledge of Dolsky's pharmaceutical background and/or experience.  Dolsky purports to be a bona fide business owner, but in reality, was recruited to serve as co-owner of the pharmacy because he could arrange for and facilitate illegal, collusive arrangements with Prescribers and Clinic Controllers, and ensure the prescription and steering of voluminous prescriptions to AV Chemists.

53.     Upon information and belief, Dolsky has no involvement in the day-to-day operations of AV Chemists and in fact, has maintained a residence in Puerto Rico since at least 2021.

54.     Prior to Dolsky's involvement, AV Chemists submitted less than $20,000.00 in pharmaceutical billing to GEICO.  Once Dolsky became a co-owner of AV Chemists, the pharmacy suddenly began receiving voluminous prescriptions from Prescribers and Clinic Controllers who work at or are associated with various No-Fault Clinics.

55.     Dolsky has long-standing financial and business relationships with individuals involved in No-Fault insurance fraud that allowed the Defendants to gain access to a steady stream of prescription referrals, irrespective of where the patients resided or received healthcare services.  Specifically, Dolsky is part of a network of individuals who regularly participate in the illegal ownership and control of healthcare practices, arrange for fraudulent insurance claims to be "funded," and facilitate illegal referral and financial arrangements designed to generate large profits from the submission of fraudulent insurance claims to No-Fault insurers.

56.     In fact, Dolsky has a substantial history of healthcare fraud schemes.  Dolsky was a named defendant in multiple federal affirmative fraud litigations involving medically unnecessary healthcare services billed to No-Fault insurers pursuant to illegal kickback and referral arrangements, including State Farm Mut. Auto. Ins. Co. et al. v. Metro Pain Specialists P.C. et al., Docket No. 1:21-cv-05523, D.E. No. 388 (MKB)(PK) (E.D.N.Y. 08/17/2023), Liberty Mut. Ins. Co. et al. v. Advanced Comprehensive Lab., LLC et al., Docket No. 1:22-cv-03541 (AMD)(JRC) (E.D.N.Y. 6/16/2022), and Allstate Ins. Co. et al. v. Advanced Comprehensive Lab., LLC et al., Docket No. 1:23-cv-06108 (KAM)(PK) (E.D.N.Y. 8/14/2023).

57.     In furtherance of the fraudulent scheme, the Defendants entered into complex financial and kickback arrangements with one another and others, including the Prescribers and Clinic Controllers at No-Fault Clinics, that were designed to, and did, conceal the fact that the

Defendants unlawfully exchanged kickbacks and/or other financial consideration for large volumes of prescriptions for specifically targeted Fraudulent Pharmaceuticals.

58.     The prescriptions for the Fraudulent Topical Pain Products and Vimovo Products steered to AV Chemists were typically based on generic, preprinted, and boilerplate examination reports meant to justify continuous, voluminous, and excessive healthcare services, including prescriptions for pharmaceuticals, as part of predetermined protocols and collusive arrangements. Further, the Fraudulent Topical Pain Products themselves often had no proven efficacy beyond what an over-the-counter equivalent could provide and were often duplicative of other medications contemporaneously prescribed and dispensed to the Insureds.

59.     To facilitate the steering of large volumes of prescriptions for the targeted Fraudulent Pharmaceuticals, the Defendants arranged for the use of purported "telephone" prescriptions as a basis to dispense large volumes of Fraudulent Pharmaceuticals in a predetermined, protocol fashion without regard to genuine patient care.

60.     As of March 27, 2016, to combat the growing problem of prescription fraud, N.Y. Public Health Law requires that all prescriptions issued in New York State – for both controlled and non-controlled substances – must be prescribed electronically.

61.     In the limited circumstances in which a prescription is excepted from the electronic prescription requirement, N.Y. Public Health Law requires that a written prescription in New York State be written on an official *serialized* New York State prescription blank bearing the prescriber's signature as well as the legible, conspicuous imprinted or stamped name of the authorized prescribing healthcare provider. See N.Y. Public Health Law § 281; see also N.Y. Education Law § 6810(8).

62.     The limited exceptions to the electronic prescription requirement include: (i) temporary technological or electronic failure, (ii) a waiver granted to the prescriber by the New York State Commissioner of Health, (iii) a determination by the prescriber that it would be impractical for patients to receive prescriptions in a timely manner if prescribed electronically, or (iv) the prescription will be dispensed by a pharmacy outside of New York State. See N.Y. Public Health Law § 281.

63.     Given the limitations on non-electronic prescriptions in New York State, it is highly unlikely that AV Chemists would receive large numbers of prescriptions via telephone calls to the pharmacy that legitimately meet the limited exceptions to New York State's electronic prescribing requirements.

64.     Notably, Nektalov claimed under oath that he would never fill a prescription that was not electronic and that AV Chemists generally required electronic prescriptions, except for the possibility of a "last minute" telephone prescription. Yet, AV Chemists routinely billed GEICO for large sums of Fraudulent Pharmaceuticals based solely on alleged telephone calls to the pharmacy by multiple Prescribers and multiple No-Fault Clinics.

65.     To the extent that AV Chemists received any such "telephone" orders, the pharmacy's printed "telephone" prescription records often fail to provide any information that verifies the identity of the person calling in the oral prescription or the reason for the prescription being issued by telephone. A sample of the "telephone" prescriptions purportedly issued by the Prescribers, which the Defendants submitted to GEICO in support of their fraudulent billing, is annexed hereto as Exhibit "2."

66.     In other instances, AV Chemists purported to dispense the Fraudulent Pharmaceuticals in response to electronic prescriptions from a physician assistant, but some of

these electronic prescriptions failed to conform with New York law in that they did not contain the name of the supervising physician (the "Invalid E-Scripts").  See e.g., 10 NYCRR § 94.2.  A sample of the Invalid E-Scripts (electronic prescriptions from physician assistants without the name of the supervising physician) which the Defendants submitted to GEICO in support of their fraudulent billing, is annexed hereto as Exhibit "3."

67.     Upon information and belief, the Defendants intentionally submitted prescriptions, that were unauthorized by any practitioner or physician assistant, and/or were not issued with the knowledge of, or any oversight by, a supervising physician, to claim reimbursement of inflated charges to which they were never entitled, including a large volume of purported "telephone" prescriptions.

68.     Nevertheless, AV Chemists routinely submitted billing to GEICO based on purported telephone prescriptions and/or Invalid E-Scripts issued pursuant to predetermined fraudulent treatment and billing protocols, and illegal, collusive arrangements that prevented the Insureds from using a pharmacy of their choice, to the extent the prescriptions were even genuine.

69.     In fact, about 73% of the Insureds that allegedly received pharmaceuticals dispensed by AV Chemists lived outside of Queens County, New York, where the pharmacy is located, with these Insureds' residences scattered throughout Brooklyn, the Bronx, Manhattan and Long Island, including Nassau and Suffolk County.

70.     In some instances, the Insureds who received, or purportedly received, pharmaceuticals dispensed by AV Chemists lived in cities and counties outside of New York City, including Rockland County, Orange County, Richmond County, and with some residences located outside of the State of New York, such as Pennsylvania and Connecticut.

71.     On average, Insureds resided approximately 28 miles from AV Chemists with an average door-to-door driving time of over 45 minutes.

72.     The Defendants plainly colluded with the Prescribers and Clinic Controllers to ensure that they directed the prescriptions for the Fraudulent Pharmaceuticals to AV Chemists regardless of (i) the distance of the pharmacy to the Insureds' residences or the Prescribers' practices; and (ii) the fact that that there were countless other pharmacies located much closer to the Insureds' residences.

73.     But for the Defendants' illegal, collusive agreements with the Prescribers and Clinic Controllers, these Insureds would not have received pharmaceutical products from a pharmacy that is located in a county or city outside of their place of residence.

74.     The Prescribers and Clinic Controllers directed prescriptions for the Fraudulent Pharmaceuticals to AV Chemists, irrespective of the pharmacy's inconvenient location to the Insureds' residences or the Prescribers' practices, because the prescriptions were being issued pursuant to illegal, collusive kickback agreements.

75.     Notably, the Prescribers and No-Fault Clinics that were the main source of the prescriptions steered to AV Chemists have been the subject of investigations and lawsuits with regard to their fraudulent billing and treatment practices, and have been the source of excessive, fraudulent treatment and billing schemes aimed at generating profits without regard to genuine patient care.

76.     Unlicensed laypersons (i.e., the Clinic Controllers), rather than the healthcare professionals working at the No-Fault Clinics, create and control the patient bases at the clinics, and dictate predetermined fraudulent treatment protocols used to maximize profits without regard to actual patient care.  These predetermined protocols almost always involve the rendering and

prescribing of excessive medically unnecessary healthcare goods and services and illegal referral and/or prescription practices.

77.     In keeping with the fact that the prescriptions were the byproducts of illegal, collusive arrangements and fraudulent treatment protocols, a substantial majority of the prescriptions steered to AV Chemists originate from only four healthcare practices – Anjani Sinha Medical PC ("Sinha Medical"), CitiMedical Services PC ("CitiMedical"), CitiMed Complete Medical Care PC ("CitiMed Complete Medical"), and CitiMedical I, PLLC ("CitiMedical I") (collectively, the "CitiMedical PCs").

78.     Specifically, AV Chemists received numerous purported prescriptions allegedly issued by Anjani Sinha, M.D. ("Dr. Sinha"), who owns Sinha Medical and purports to render healthcare services at various No-Fault Clinics and ambulatory surgical centers, including CitiMed Surgery Center LLC ("CitiMed Surgery").

79.     Notably, nearly every single prescription steered to AV Chemists using Dr. Sinha's name and medical license number was a purported "telephone" prescription for the same set of pharmaceuticals – Vimovo (Naproxen/Esomeprazole), Aspirin, and First Aid Antibiotic Ointment (an over-the-counter product and non-reimbursable under No-Fault regulations).

80.     When Dr. Sinha and his counsel were presented with multiple bills and "telephone" prescriptions submitted to GEICO – using Dr. Sinha's name – for Vimovo (Naproxen/Esomeprazole), Aspirin, and First Aid Antibiotic Ointment products, Dr. Sinha swore under oath, via an affidavit signed and notarized on April 4, 2023, that the prescriptions were unauthorized by him.

81.     Specifically, Dr. Sinha swore that: (i) he was "unfamiliar with AV Chemists"; (ii) "[he] did not issue or authorize any of the prescriptions…or any similar telephone prescriptions"

that were submitted to GEICO using his name, license number, and a prior Patchogue, NY address; (iii) "[he] did not authorize anyone to call this pharmacy….to order the pharmaceuticals listed on the Purported Telephone Prescriptions"; and (iv) it "has never been [his] practice to prescribe, via telephone or otherwise, the combination of three drugs – Naproxen, Esomeprazole 500-20MG (brand name 'Vimovo'), Aspirin EC 81 MG tablets, and First Aid Antibiotic 400/3.5/5000 Ointment – listed in the Telephone Prescriptions to [his] patients."

82.      Incredibly, after signing the affidavit described above and having it witnessed by a notary public (while being represented by independent legal counsel), Dr. Sinha has attempted to disavow the affidavit, suggesting through his counsel that he had somehow made a "mistake."  Dr. Sinha, however, has never offered a coherent explanation for his purported mistake in signing the affidavit while represented by counsel  – nor any good faith explanation of how the prescriptions could be legitimate given his plain, unequivocal statements in the affidavit that he was unfamiliar with AV Chemists, did not authorize the prescriptions, did not authorize anyone to call AV Chemists on his behalf, and never had a practice of prescribing the three drugs repeatedly dispensed by AV Chemists using his name.

83.      The three other healthcare practices that steered a substantial majority of the prescriptions to AV Chemists include the CitiMedical PCs, which are all owned on paper by Regina Moshe, M.D. ("Dr. Moshe").  Dr. Moshe is also the record owner of CitiMed Surgery, an ambulatory surgical center from which Sinha Medical renders healthcare services.  Dolsky and Dr. Moshe are long-time friends and business associates who together, along with others, have engaged in No-Fault fraud schemes. In fact, Dolsky and Dr. Moshe, as well as others, were named as defendants in State Farm Mut. Auto. Ins. Co. et al. v. Metro Pain Specialists P.C. et al., Docket No. 1:21-cv-05523, D.E. No. 388 (MKB)(PK) (E.D.N.Y. 08/17/2023), wherein the insurer-

plaintiffs credibly alleged that Dolsky and Dr. Moshe, as well as others, entered mutually beneficial and illegal financial arrangements and that Dr. Moshe agreed to front as the "owner" of fraudulent medical practices, including the CitiMedical PCs.

84.     Tellingly, between 2019 and 2021, the CitiMedical PCs alone were the source of more than 80% of the prescriptions steered to and billed through AV Chemists.  Many of the prescriptions originating from the CitiMedical PCs were "telephone" prescriptions – similar to the ones allegedly issued by Dr. Sinha – using the names of various medical practitioners associated with the CitiMedical PCs, including Olanrewaju Adeosun, M.D. ("Dr. Adeosun"), Mark Goodstein, M.D. ("Dr. Goodstein"), and Richard Allen Badke, M.D. ("Dr. Badke").

85.     There are plainly serious concerns regarding the validity of the voluminous "telephone" prescriptions submitted to GEICO using the name of the CitiMedical PCs' doctors, as well as Dr. Sinha, in addition to substantial evidence that the prescriptions – even if valid – were issued pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care or medical necessity.

86.     Indeed, the Defendants' routine submission of large volumes of billing to GEICO based on "telephone" prescriptions purportedly issued by practitioners associated with the CitiMedical PCs and Dr. Sinha for the targeted Fraudulent Pharmaceuticals – *with exorbitant charges often amounting to thousands of dollars per patient* – has no legitimate explanation, beyond the fact that the Defendants engaged in illegal, collusive arrangements to steer the Prescribers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to AV Chemists.

87.     The long-standing personal and business relationships between Dolsky and Dr. Moshe were integral to the Defendants' scheme because it allowed them to obtain patient referrals from the CitiMedical PCs and other suspect No-Fault Clinics pursuant to predetermined protocols.

88.     In fact, Dolsky, who resides in Puerto Rico, is the record owner of Optimum Health Acupuncture, P.C. ("Optimum"), which operates at various clinic locations where the CitiMedical PCs also operate.  Moreover, the CitiMedical PCs and Optimum shared the same postal meter used to submitting billing to GEICO.

89.     In keeping with the fact that the Defendants entered into illegal, collusive agreements and participated in kickback schemes, AV Chemists also received prescriptions from No-Fault Clinics that were identified in a federal criminal indictment involving a wide-ranging scheme being run by Nathaniel Coles (an unlicensed layperson) who paid kickbacks in exchange for patient contact information so that they could steer those patients to treat at certain clinics.  See USA v. Rose, 19-cr-00789 (PGG).

90.     The Government affidavits unsealed in USA v. Rose include excerpts of wiretaps and other evidence indicating that, among dozens of other locations, patients were steered to the following layperson-controlled No-Fault Clinic locations from where the CitiMedical PCs operated and steered prescriptions to AV Chemists: (i) 910 E Gun Hill Road, Bronx, New York; and (ii) 6555 Woodhaven Blvd., Rego Park, New York.

91.     As noted above, Insureds were virtually never given the option to use a pharmacy of their choosing; instead, the Prescribers and Clinic Controllers directed prescriptions (or purported prescriptions) for the Fraudulent Pharmaceuticals to AV Chemists, irrespective of the pharmacy's inconvenient location to the Insureds' residences or the Prescribers' practices, because the prescriptions were being issued pursuant to illegal, collusive kickback arrangements.

92.     The Prescribers and Clinic Controllers would not have engaged in the illegal, collusive arrangements with the Defendants in violation of New York law, including intentionally prescribing the Fraudulent Pharmaceuticals, and directing those prescriptions to AV Chemists, unless they profited from their participation in the illegal scheme either by way of direct kickbacks or other financial incentives, such as employment at a No-Fault Clinic.

93.     Based upon information and belief, in certain instances, monies used for kickbacks to the Prescribers and Clinic Controllers at No-Fault Clinics were disguised as ostensibly legitimate fees for "marketing", "consulting", "advertising", "billing", "collection" and/or "administrative" services purportedly provided to AV Chemists by DN Spark Consulting Inc. ("DN Spark Consulting"). DN Spark Consulting is owned by Nektalov and purports to be a marketing company that also serves as a liaison between injured parties and personal injury attorneys.

94.     Nektalov stated under oath that AV Chemists' employees handled the pharmacy's billing and collections. Yet, between January 2022 and November 2021, AV Chemists issued payments totaling more than $375,000.00 to DN Spark Consulting for a myriad of purported services including billing and collections.  Based upon information and belief, these monies were used as kickback payments that resulted in the prescription of excessive amounts of medically unnecessary pharmaceutical products such as the Fraudulent Topical Pain Products and Vimovo Products that were thereafter billed through AV Chemists.

95.     The Defendants implemented their pharmaceutical fraud scheme involving the Prescribers and Clinic Controllers knowing that: (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined protocols designed to exploit the patients for financial gain, without regard to genuine patient care; (ii) the Fraudulent Pharmaceuticals were the

product of illegal, collusive agreements intended to inflate the billing from AV Chemists to insurers and to financially enrich the Defendants; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products and the Vimovo Products) that they dispensed in large volumes to Insureds through AV Chemists with exorbitant charges; and (iv) the Fraudulent Pharmaceuticals were prescribed and dispensed without regard for the availability of a wide range of OTC and prescription medications proven to have therapeutic effects and available at a fraction of the cost.

**B.      The Fraudulent Topical Pain Products Were Prescribed and Dispensed Without Regard to Genuine Patient Care**

96.      In basic terms, the goal of medical treatment is to help patients get better in a timely manner.  Notwithstanding this basic goal, the Insureds treated by the Prescribers at No-Fault Clinics associated with the Clinic Controllers – and who received pharmaceuticals from AV Chemists – were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacks in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

97.      Evidence-based best practices guidelines for the treatment of acute and chronic pain do exist and should always guide prescribing habits. For example, the World Health Organization ("WHO") pain relief ladder recommends a non-opioid such as acetaminophen or an oral non-steroidal anti-inflammatory drug ("NSAID") for the initial management of pain. Oral NSAIDs are the most commonly prescribed analgesic medications worldwide, and their efficacy for treating acute pain has been well demonstrated. If pain relief is not achieved, and doses are maximized, then an adjuvant oral agent may be added to the medication regimen – including the use of muscle

relaxers and medications that block neuropathic pain transmission. Finally, opiates may be prescribed for short-term, limited use.

98.     More recently, in 2019 the Department of Health & Human Services ("DHHS") issued a Pain Management Best Practices Inter-Agency Task Force Report which focused on pain management and the treatment of acute and chronic pain.  According to the DHHS report, such pain should be treated using an individualized, multimodal approach which may include prescription medications depending on various biological, psychological, and social factors of an individual patient, including, but not limited to, a patient's age, medical history, pain tolerance, genetics and neurological factors, stress level, coping ability, social support, and even education and cultural factors. A risk-benefit analysis should be applied to each patient prior to determining whether a medication is clinically appropriate. Like the WHO pain relief ladder, the DHHS report indicates that non-opioids (e.g., oral NSAIDs) should be used as first line therapy for patients for whom medications are clinically appropriate.

99.     Notably, for a drug to alleviate pain it must reach nerve or tissue receptors responsible for producing or transmitting a person's sensation of pain.

100.    Oral pain relievers reduce or alleviate pain by entering the bloodstream through the gastrointestinal system and traveling to the relevant nerve or tissue receptors. Some of the limited circumstances in which a physician would prescribe a topical medication include patients in whom these oral medications are contraindicated. For example – patients with moderate to severe kidney or liver dysfunction, or those with comorbidities that preclude the use of oral NSAIDs (e.g., history of peptic ulcer disease, coronary artery disease, or congestive heart failure).

101. With respect to treating acute pain (e.g., from strains, sprains, contusions, or overuse injuries), clinical studies of FDA-approved topical NSAIDs, such as Diclofenac Gel 1% have shown that they are no more effective than a placebo.

102. Despite these guidelines and the basic goal of helping patients recover in a timely fashion, the Prescribers produced generic, preprinted, and boilerplate examination reports designed to justify continued, voluminous, and excessive healthcare services that the healthcare providers at the various No-Fault Clinics purported to render to Insureds as part of a predetermined protocol which lacked any individualized treatment whatsoever. These healthcare services included the prescription of excessive and medically unnecessary pharmaceutical drug products.

103. Prescribing a multitude of pharmaceutical drug products without first taking a detailed patient history demonstrates a gross indifference to patient health and safety as the Prescribers often did not know whether the patient was taking any medication or suffering from any co-morbidity that would contraindicate the use of a particular prescribed drug product.

104. The Prescribers also failed to document in their examination reports whether the patients were intolerant of oral medications thereby necessitating a prescription for a Fraudulent Topical Pain Product.

105. The Prescribers also failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to a particular patient and dispensed by AV Chemists were actually used by the patient.

106. The Prescribers also failed to document in their follow-up examinations whether the Fraudulent Pharmaceuticals dispensed by AV Chemists provided any relief to the patient or

whether the patient experienced any side effects associated with the prescribed pharmaceutical product.

107.     In some instances, the Prescribers failed to document in any of their examination reports that the patient was to receive a Fraudulent Pharmaceutical.

108.     Nevertheless, the Prescribers routinely prescribed voluminous Fraudulent Pharmaceuticals, including multiple Fraudulent Pharmaceuticals on the same date to a single patient.

109.     Notably, each year in the United States, approximately 4.5 million ambulatory care visits and 100,000 deaths occur because of adverse drug reactions. A substantial number of these adverse drug reactions are the result of improper prescription practices associated with therapeutic duplication.  See, Mathew Witry, PharmD, PhD, Medication List Discrepancies and Therapeutic Duplications Among Dual Use Veterans, Federal Practitioner, 14 (September 2016).

110.     Therapeutic duplication is the prescribing and dispensing of two or more drugs from the same therapeutic class – such as oral and topical NSAIDs (e.g., Ibuprofen and Diclofenac Gel 3%) – which puts the patient at greater risk of adverse drug reactions without providing any additional therapeutic benefit.

111.     Nevertheless, Prescribers consciously issued multiple prescriptions for multiple Fraudulent Pharmaceuticals and the Defendants consciously dispensed Diclofenac Gel 3% in conjunction with oral NSAIDs to numerous Insureds, thereby engaging in therapeutic duplication, despite the risks it posed to the Insureds' health and well-being. For example:

- Insured K.S.H. was allegedly involved in a motor vehicle accident on January 14, 2022, and subsequently sought treatment with Susana Yakubova N.P. ("NP Yakubova") of Bronx Medical Professional, P.C. d/b/a Sagy Grinberg, MD ("Bronx Medical"). On January 26, 2022, AV Chemists dispensed Diclofenac Gel 3% and Naproxen to K.S.H. pursuant to "telephone" prescriptions purportedly issued by NP Yakubova on January 26, 2022.  Notably, the aforementioned prescriptions were issued nearly 1 week *after*

the examination of K.S.H. and there is no documentation of the prescribed medications in NP Yakubova's examination report. Further, the simultaneous dispensing of Diclofenac Gel 3% and Naproxen constitutes therapeutic duplication. Moreover, in light of K.S.H.'s medical history of hypertension, any NSAIDs – such as Diclofenac Gel 3% and Naproxen – should be prescribed with significant caution especially given the fact that the patient is taking four medications to manage his hypertension.  Despite this, there is no documentation that the patient was advised on the use of NSAIDs, in conjunction with medications for hypertension.

- Insured K.M. was allegedly involved in a motor vehicle accident on April 16, 2022, and subsequently sought treatment with Dr. Badke of CitiMed Complete Medical. On November 18, 2022, AV Chemists dispensed Diclofenac Gel 3%, Ibuprofen, and Lidocaine 5% Patches to K.M. pursuant to "telephone" prescriptions purportedly issued by Dr. Badke on November 17, 2022 – one day *after* the examination of K.M.  Notably, K.M. was issued prescriptions for Lidocaine 5% Patches and Ibuprofen with 2 refills despite the fact that K.M. advised Dr. Badke that these pharmaceuticals were "not working," as documented in the examination report. Thereafter, on December 16, 2022 and January 10, 2023, AV Chemists dispensed refills of Diclofenac Gel 3%, Ibuprofen and Lidocaine 5% Patches to K.M.  Notably, the simultaneous dispensing of Diclofenac Gel 3% and Ibuprofen constitutes therapeutic duplication. Moreover, K.M.'s medical history includes hypertension and accordingly, any NSAIDs – such as Diclofenac Gel 3% and Ibuprofen – should be prescribed with caution. Despite this, there is no documentation that the patient was advised on the use of NSAIDs, in conjunction with any medication for hypertension.

- Insured J.K. was allegedly involved in a motor vehicle accident on September 15, 2018, and subsequently sought treatment with Michael Jurkowich, M.D. ("Dr. Jurkowich") of CitiMedical I. On April 2, 2019, AV Chemists dispensed Diclofenac Gel 3%, Naproxen, and Cyclobenzaprine to J.K. pursuant to prescriptions issued by Dr. Jurkowich on January 30, 2019 and April 1, 2019. Notably, the prescription for Diclofenac Gel 3% was purportedly issued by Dr. Jurkowich seven (7) days after the examination of J.K. and there is no documentation of the prescribed medication in his examination report. Moreover, the simultaneous dispensing of Diclofenac Gel 3% and Naproxen constitutes therapeutic duplication.

- Insured S.K. was allegedly involved in a motor vehicle accident on April 30, 2019, and subsequently sought treatment with Daniel Khaimov, M.D. ("Dr. Khaimov") of the Office of Daniel Khaimov M.D. ("Khaimov MD").  On July 29, 2022, AV Chemists dispensed Diclofenac Gel 3% and Naproxen to S.K. pursuant to prescriptions issued by Dr. Khaimov on May 10, 2022 and July 26, 2022, respectively. Further, on September 2, 2022, AV Chemists dispensed Diclofenac Gel 3% and Meloxicam to S.K. pursuant to prescriptions issued by Dr. Khaimov on May 10, 2022 and August 30, 2022, respectively. Notably, the simultaneous dispensing of Diclofenac Gel 3% and Naproxen, as well as Diclofenac Gel 3% and Meloxicam, constitute therapeutic duplication.

- Insured V.K. was allegedly involved in a motor vehicle accident on October 9, 2018, and subsequently sought treatment with Dr. Goodstein of CitiMedical I. On December 12, 2018, AV Chemists dispensed Diclofenac Gel 3%, Ibuprofen and Omeprazole to V.K. pursuant to prescriptions issued by Dr. Goodstein on December 12, 2018. Notably, Dr. Goodstein did not document the prescription of Omeprazole in his examination report. Moreover, the simultaneous dispensing of Diclofenac Gel 3% and Ibuprofen constitutes therapeutic duplication.

112.    Moreover, in keeping with the fact that the Defendants targeted a specific set of exorbitantly priced pharmaceuticals that were not medically necessary and were prescribed and dispensed pursuant to predetermined treatment protocols and illegal, collusive agreements, Insureds involved in the same motor vehicle accident were often subjected to nearly identical course of treatment and prescribed the same set of Fraudulent Pharmaceuticals, regardless of the Insured's individual circumstances or actual injuries, and without regard to genuine patient care. For example:

- On March 20, 2022, two Insureds – M.D. and M.L.D. – were involved in the same motor vehicle accident. Thereafter, M.D. and M.L.D. sought treatment with Dr. Adeosun of CitiMed Complete Medical at a No-Fault Clinic located at 92-18 165th Street, Jamaica, New York. M.D. and M.L.D. were in different physical conditions and experienced the impact from different positions in the vehicle.  Nonetheless, M.D. and M.L.D. were issued prescriptions for the same set of Fraudulent Pharmaceuticals, namely, Lidocaine 5% Ointment, Vimovo and Cyclobenzaprine.

  o On April 4, 2022, AV Chemists dispensed Lidocaine 5% Ointment, Vimovo, and Cyclobenzaprine to M.D. pursuant to prescriptions purportedly issued by Dr. Adeosun on April 1, 2022.  Notably, the aforementioned prescriptions were issued ten (10) days *after* the purported examination of M.D.  Moreover, M.D.'s medical history includes hypertension. Despite M.D.'s medical history, Dr. Adeosun failed to document any medication that the patient was taking for hypertension, which could make him an unsuitable candidate for the use of NSAIDs – such as Naproxen (a medicine contained in Vimovo Products). Further, there is no documentation that the patient was advised on the use of NSAIDs, in conjunction with any medication for hypertension.

  o On April 5, 2022, AV Chemists dispensed Lidocaine 5% Ointment, Vimovo, and Cyclobenzaprine to M.L.D. pursuant to prescriptions purportedly issued by

Dr. Adeosun on April 1, 2022.  Notably, the aforementioned prescriptions were issued ten (10) days *after* the purported examination of M.L.D.

- On November 14, 2022, three Insureds – A.T., J.U. and E.P. were involved in the same motor vehicle accident. Thereafter, A.T., J.U., and E.P. sought treatment with Richard Aminov, P.A. ("PA Aminov") of Sinha Medical at a No-Fault Clinic located at 79-45 Metropolitan Ave, Middle Village, New York.  A.T., J.U., and E.P. were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, A.T., J.U., and E.P. were issued prescriptions for the same set of Fraudulent Pharmaceuticals, namely, Vimovo, Aspirin, and First Aid Antibiotic Ointment.

  o On February 22, 2023, AV Chemists dispensed Vimovo, Aspirin, and First Aid Antibiotic Ointment to A.T. pursuant to "telephone" prescriptions purportedly issued by Dr. Sinha on February 21, 2023.  Notably, Dr. Sinha did not examine A.T. on February 21, 2023 and there was no documentation of the dispensed Vimovo Products and First Aid Antibiotic Ointment in the examination and surgical reports.
  o On March 8, 2023, AV Chemists dispensed Vimovo, Aspirin, and First Aid Antibiotic Ointment to J.U. pursuant to "telephone" prescriptions purportedly issued by Dr. Sinha on March 7, 2023. Notably, Dr. Sinha did not examine J.U. on March 7, 2023 and there was no documentation of the dispensed Vimovo Products and First Aid Antibiotic Ointment in the examination and surgical reports.
  o On April 13, 2023, AV Chemists dispensed and billed for Vimovo, Aspirin, and First Aid Antibiotic Ointment to E.P. pursuant to "telephone" prescriptions purportedly issued by Dr. Sinha on April 10, 2023. Notably, Dr. Sinha did not examine E.P. on April 10, 2023 and there was no documentation of the dispensed Vimovo Products and First Aid Antibiotic Ointment in the examination and surgical reports.

- On July 7, 2022, two Insureds – A.G.R. and A.G.G. – were involved in the same motor vehicle accident. Thereafter, A.G.R. and A.G.G. sought treatment with Shubrata Dey, N.P. ("NP Dey") of Sinha Medical at a No-Fault Clinic located at 3209 Fulton Street, Brooklyn, New York. A.G.R. and A.G.G. were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, A.G.R. and A.G.G. were issued prescriptions for the same set of Fraudulent Pharmaceuticals, namely, Vimovo, Aspirin, and First Aid Antibiotic Ointment.
  o On January 11, 2023, AV Chemists dispensed Vimovo, Aspirin, and First Aid Antibiotic Ointment to A.G.G. pursuant to "telephone" prescriptions purportedly issued by Dr. Sinha on January 10, 2023. Notably, Dr. Sinha did not examine A.G.G. on January 10, 2023 and there was no documentation of the dispensed Vimovo Products and First Aid Antibiotic Ointment in the examination and surgical reports.
  o On February 22, 2023, AV Chemists dispensed Vimovo, Aspirin, and First Aid Antibiotic Ointment to A.G.R. pursuant to "telephone" prescriptions

purportedly issued by Dr. Sinha on February 21, 2023. Notably, Dr. Sinha did not examine A.G.R. on February 21, 2023 and there was no documentation of the dispensed Vimovo Products and First Aid Antibiotic Ointment in the examination and surgical reports.

- On June 15, 2020, two Insureds – J.C. and A.P. – were involved in the same motor vehicle accident. Thereafter, JCI and AP sought treatment with Raed Hattab, M.D. ("Dr. Hattab") of CitiMedical at a No-Fault Clinic located at 14 Mamaroneck Avenue, 2nd Floor, White Plains, New York. J.C. and A.P. were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, J.C. and A.P. were issued prescriptions for the same set of Fraudulent Pharmaceuticals, namely, Lidocaine 5% Patches, Cyclobenzaprine, and Naproxen.
  - On August 10, 2020, AV Chemists dispensed Lidocaine 5% Patches, Cyclobenzaprine, and Naproxen to J.C. pursuant to prescriptions purportedly issued by Dr. Hattab on August 3, 2020.
  - On July 9, 2020, AV Chemists dispensed Lidocaine 5% Patches, Cyclobenzaprine, and Naproxen to A.P. pursuant to prescriptions purportedly issued by Dr. Hattab on July 6, 2020. Notably, there is no corresponding examination of A.P. by Dr. Hattab on or about July 6, 2020.

- On December 1, 2022, two Insureds – M.P. and W.V. were involved in the same motor vehicle accident. Thereafter, M.P. and W.V. sought treatment with NP Dey of Sinha Medical at a No-Fault Clinic located at 3209 Fulton Street, Brooklyn, New York. M.P. and M.V. were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, M.P. and W.V. were issued prescriptions for the same set of Fraudulent Pharmaceuticals, namely, Vimovo, Aspirin, and First Aid Antibiotic Ointment.
  - On February 1, 2023, AV Chemists dispensed Vimovo, Aspirin, and First Aid Antibiotic Ointment to M.P. pursuant to "telephone" prescriptions purportedly issued by Dr. Sinha on January 31, 2023. Notably, Dr. Sinha did not examine M.P. on January 31, 2023 and there was no documentation of the dispensed Vimovo Products and First Aid Antibiotic Ointment in the examination and surgical reports.
  - On March 29, 2023, AV Chemists dispensed Vimovo, Aspirin, and First Aid Antibiotic Ointment to M.V. pursuant to prescriptions purportedly issued by Dr. Sinha on March 28, 2023. Notably, Dr. Sinha did not examine W.V. on March 28, 2023 and there was no documentation of the aforementioned pharmaceuticals in the examination and surgical reports.

- On September 17, 2022, two Insureds – N.S. and A.K. were involved in the same motor vehicle accident. Thereafter, N.S. and A.K. sought treatment with Laura Robinson, P.A. ("PA Robinson") of CitiMed Complete Medical at a No-Fault Clinic located at 139 N. Central Ave, Valley Stream, New York. N.S. and A.K. were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, N.S. and A.K. were issued prescriptions for the same set of Fraudulent

Pharmaceuticals, namely, Lidocaine 5% Ointment and Ibuprofen with 2 refills for each medication.

- o On December 2, 2022, AV Chemists dispensed Lidocaine 5% Ointment and Ibuprofen to N.S. pursuant to prescriptions purportedly issued by PA Robinson on December 1, 2022. AV Chemists dispensed refills of the aforementioned pharmaceuticals to N.S. on January 5, 2023 and January 26, 2023.
- o On December 3, 2022, AV Chemists dispensed Lidocaine 5% Ointment and Ibuprofen to A.K. pursuant to prescriptions purportedly issued by PA Robinson on December 1, 2022. AV Chemists dispensed refills of the aforementioned pharmaceuticals to A.K. on January 5, 2023 and January 30, 2023.

Notably, the electronic prescriptions issued to N.S. and A.K. fail to conform with New York law in that they did not contain the name of PA Robinson's supervising physician.

- On April 6, 2022, two Insureds – J.T. and T.M. were involved in the same motor vehicle accident. Thereafter, J.T. and T.M. sought treatment with Dr. Adeosun of CitiMed Complete Medical at a No-Fault Clinic located at 14 Mamaroneck Avenue, 2nd Floor, White Plains, New York. J.T. and T.M. were in different physical conditions and experienced the impact from different positions in the vehicle.  Nonetheless, J.T. and T.M. were issued prescriptions for the same set of Fraudulent Pharmaceuticals, namely, Lidocaine 5% Ointment, Vimovo, and Cyclobenzaprine with 3 refills for each medication.
  - o On May 5, 2022, AV Chemists dispensed Lidocaine 5% Ointment, Vimovo, and Cyclobenzaprine to J.T. pursuant to "telephone" prescriptions purportedly issued by Dr. Adeosun on May 2, 2022. AV Chemists dispensed refills of the aforementioned pharmaceuticals to J.T. on June 9, 2022 and July 30, 2022.
  - o On May 12, 2022, AV Chemists dispensed Lidocaine 5% Ointment, Vimovo, and Cyclobenzaprine to T.M. pursuant to "telephone" prescriptions purportedly issued by Dr. Adeosun on May 4, 2022. AV Chemists dispensed refills of the aforementioned pharmaceuticals to T.M. on June 14, 2022, July 26, 2022 and September 9, 2022.

113.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact will all affect whether, how, and to what extent an individual is injured in a given automobile accident.

114.    It is extremely improbable that multiple Insureds involved in the same automobile accident would routinely require the same pharmaceutical products.

115.    Even so, pursuant to the fraudulent and collusive arrangements, and as demonstrated herein, the Prescribers prescribed, and AV Chemists dispensed the same set of

Fraudulent Pharmaceuticals to Insureds involved in a single motor vehicle accident, without regard to individualized, genuine patient care.

### C.    The Fraudulent Topical Pain Products

116.    In accordance with the fraudulent scheme discussed above, and despite the best practices outlined above, AV Chemists routinely billed GEICO for exorbitantly priced topical pain gels, ointments, and lotions, overwhelmingly in the form of Lidocaine 5% Ointment and Lidocaine 5% Patches pursuant to duplicitous prescriptions solicited from Prescribers and Clinic Controllers in exchange for kickbacks or other financial incentives.

117.    The Defendants solicited the Prescribers and the Clinic Controllers to provide AV Chemists with voluminous prescriptions for Fraudulent Topical Pain Products because the Defendants could readily buy Lidocaine 5% Ointment and Lidocaine 5% Patches at low cost and bill GEICO and other New York No-Fault insurers huge sums based on egregiously high wholesale prices.

118.    Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the body. Lidocaine 5% Ointment is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison sumac, abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such as sutures or injections. Notably, Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

119.    Excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects including, among others, bradycardia, hypotension, and cardiovascular collapse that may lead to cardiac arrest.  Accordingly, patients should be instructed

to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment should not exceed 5 grams.

120.     Oftentimes, Prescribers failed to indicate the maximum dosage on any prescriptions and instead, instructed Insureds to apply Lidocaine 5% Ointment daily "as needed".

121.     Notably, Lidocaine ointments and patches with 4% Lidocaine are available over-the-counter and have a similar efficacy as Lidocaine 5% at a fraction of the cost.

122.     Over-the-counter products such as Icy Hot Lidocaine, which contains 4% Lidocaine, are available at most well-known pharmacy retailers such as Rite-Aid and Target for advertised prices in the range of $10 or less.

123.     Despite this, the Prescribers never recommended Insureds first use over-the-counter lidocaine products to treat their minor aches and pains sustained in fender-bender type motor vehicle accidents. Rather, pursuant to collusive arrangements and predetermined protocols, the Prescribers routinely prescribed Insureds Lidocaine 5% Ointment and directed the prescriptions to AV Chemists, typically billing $1,147.85 and $1,909.75 per prescription.

124.     In further keeping with the fact that Lidocaine 5% Ointment was prescribed and dispensed pursuant to collusive arrangements and predetermined protocols, the initial examination reports prepared by the Prescribers virtually never set forth the medical basis for the Lidocaine 5% Ointment prescriptions.

125.     Likewise, the follow-up examination reports often failed to address whether the Lidocaine 5% Ointment prescribed provided any pain relief to the patient or was otherwise

effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

126.    The Defendants also routinely dispensed and billed GEICO for exorbitantly-priced pain patches, primarily in the form of Lidocaine 5% Patches, despite the availability of less expensive, commercially available FDA-approved patches.

127.    Notably, topical pain patches in which the primary ingredient is lidocaine are mainly used to treat chronic post-herpetic neuropathic pain (i.e., continued nerve pain after a patient recovers from shingles), although studies have shown that any relief these patches provide – beyond topical anesthetic relief – is more attributable to its placebo effect rather than the pharmacological action of patches themselves.  In fact, while the application of pain patches in which the primary ingredient is lidocaine provides sufficient absorption to cause an anesthetic effect, it is insufficient to produce a complete sensory block.

128.    Nevertheless, the Prescribers prescribed the Lidocaine 5% Patches to Insureds for sprain/strain injuries sustained in fender-bender type motor vehicle accidents, typically billing $229.64 to $454.28 per prescription.

129.    In keeping with the fact that the Defendants targeted a specific set of exorbitantly priced pharmaceuticals that were not medically necessary and were prescribed and dispensed pursuant to profit-driven fraudulent treatment protocols and collusive agreements, the Prescribers and Clinic Controllers regularly issued prescriptions for Lidocaine 5% Ointment or Patches with up to three refills at a time, along with oral medications, before even knowing whether the prescribed medications would provide any relief and/or side effects to the patient. For example:

- Insured K.A. was allegedly involved in a motor vehicle accident on January 24, 2020. Thereafter, KA sought treatment with CitiMedical at a No-Fault Clinic located at 14 Mamaroneck Avenue, 2nd Floor, White Plains, New York. On February 4, 2020, K.A. underwent an initial examination with Dr. Adeosun who purportedly issued

"telephone" prescriptions for Lidocaine 5% Ointment, Ibuprofen, Cyclobenzaprine, and Omeprazole with 3 refills for each medication. Notably, Dr. Adeosun did not document the prescription of Omeprazole in his examination report. On February 10, 2020, AV Chemists dispensed and billed for Lidocaine 5% Ointment, Ibuprofen, Cyclobenzaprine, and Omeprazole pursuant to prescriptions purportedly issued by Dr. Adeosun on February 4, 2020. AV Chemists dispensed and billed for refills of the aforementioned pharmaceuticals on March 21, 2020, May 4, 2020, and July 1, 2020.

- Insured K.W. was allegedly involved in a motor vehicle accident on December 5, 2022. Thereafter, K.W. sought treatment with CitiMed Complete Medical at a No-Fault Clinic located at 55 Greene Ave, Suite LLB, Brooklyn, New York. On December 19, 2022, K.W. underwent an initial examination with Dr. Adeosun who issued prescriptions for Lidocaine 5% Patches and Vimovo with 3 refills each, and Cyclobenzaprine with 2 refills. On December 19, 2022, AV Chemists dispensed and billed for Lidocaine 5% Patches, Vimovo, and Cyclobenzaprine pursuant to prescriptions issued by Dr. Adeosun on December 19, 2022. AV Chemists dispensed and billed for refills of the aforementioned pharmaceuticals on December 21, 2022, merely 2 days later.

- Insured A.B. was allegedly involved in a motor vehicle accident on June 17, 2021. Thereafter, A.B. sought treatment with CitiMed Complete Medical at a No-Fault Clinic located at 92-18 165th Street, Jamaica, New York. On June 29, 2021, A.B. underwent an initial examination with Dr. Adeosun who purportedly issued "telephone" prescriptions for Lidocaine 5% Ointment, Ibuprofen, and Cyclobenzaprine with 3 refills for each medication. On July 2, 2021, AV Chemists dispensed and billed for Lidocaine 5% Ointment, Ibuprofen, and Cyclobenzaprine pursuant to prescriptions purportedly issued by Dr. Adeosun on July 1, 2021 – two days *after* the initial examination of Insured A.B. AV Chemists dispensed and billed for refills of the aforementioned pharmaceuticals on July 29, 2021, August 24, 2021, and October 6, 2021.

- Insured B.R. was allegedly involved in a motor vehicle accident on December 2, 2019. Thereafter, B.R. sought treatment with CitiMedical at a No-Fault Clinic located at 14 Mamaroneck Avenue, 2nd Floor, White Plains, New York. On January 28, 2020, B.R. underwent an initial examination with Dr. Adeosun who purportedly issued "telephone" prescriptions for Lidocaine 5% Ointment, Ibuprofen, Cyclobenzaprine, and Omeprazole with 3 refills for each medication. On February 5, 2020, AV Chemists dispensed and billed for Lidocaine 5% Ointment, Ibuprofen, Cyclobenzaprine, and Omeprazole pursuant to prescriptions purportedly issued by Dr. Adeosun on January 28, 2020. AV Chemists dispensed and billed for refills of the aforementioned pharmaceuticals on July 9, 2020, and November 7, 2020.

- Insured S.A. was allegedly involved in a motor vehicle accident on June 23, 2019. Thereafter, S.A. sought treatment with CitiMedical I at a No-Fault Clinic located at 14 Mamaroneck Avenue, 2nd Floor, White Plains, New York. On October 8, 2019, S.A. underwent a follow up examination with Dr. Adeosun who purportedly issued

"telephone" prescriptions for Lidocaine 5% Ointment, Ibuprofen, Cyclobenzaprine, Omeprazole with 3 refills for each medication. Notably, Dr. Adeosun did not document the prescription of Omeprazole in his examination report.  On October 17, 2019, AV Chemists dispensed and billed for Lidocaine 5% Ointment, Ibuprofen, Cyclobenzaprine, and Omeprazole pursuant to prescriptions purportedly issued by Dr. Adeosun on October 8, 2019. AV Chemists dispensed and billed for refills of the aforementioned pharmaceuticals on December 19, 2019, January 16, 2020, and February 20, 2020.

- Insured C.D. was allegedly involved in a motor vehicle accident on February 6, 2019. Thereafter, C.D. sought treatment with CitiMedical I at a No-Fault Clinic located at 65-55 Woodhaven Blvd, 2nd Floor, Rego Park, New York. On March 18, 2019, C.D. underwent a follow up examination with Anam Azeem, M.D. ("Dr. Azeem") who purportedly issued prescriptions for Lidocaine 5% Patches and Naproxen with 3 refills for each medication. On March 23, 2019, AV Chemists dispensed and billed for Lidocaine 5% Patches and Naproxen pursuant to prescriptions issued by Dr. Azeem on March 18, 2019. AV Chemists dispensed and billed for refills of the aforementioned pharmaceuticals on May 18, 2019, August 14, 2019, and October 30, 2019. Notably, despite the remaining refills, on September 9, 2019, Dr. Azeem issued a second prescription for Naproxen, which AV Chemists dispensed on September 11, 2019.

130.    To date, the Defendants have submitted more than $2.2 million in claims to GEICO through AV Chemists seeking reimbursement for Lidocaine 5% Ointment and Lidocaine 5% Patches.

131.    In addition to the egregious Lidocaine prescriptions, the Defendants, at times, submitted bills to GEICO through AV Chemists seeking reimbursement for exorbitantly priced Diclofenac Gel 3% pursuant to duplicitous prescriptions solicited from Prescribers and Clinic Controllers in exchange for kickbacks or other financial incentives.

132.    As with the prescriptions for the Lidocaine prescriptions, the Defendants solicited the Prescribers and the Clinic Controllers to provide them with prescriptions for Diclofenac Gel 3% because the Defendants could bill for this pharmaceutical product at exorbitant charges, which further inflated the charges submitted to GEICO and other New York No-Fault insurers.

133.    Diclofenac Gel 1% is a topical NSAID typically used to treat joint pain caused by osteoarthritis in the hands, wrists, elbows, knees, ankles, or feet.  It has not been proven effective for treating strains or sprains.

134.    Diclofenac Gel 3%, i.e., the Diclofenac Gel prescribed by the Prescribers and dispensed by AV Chemists, is only FDA approved to treat a precancerous skin condition known as actinic keratosis.

135.    Diclofenac Gel 3% does not have any proven efficacy or safety in the treatment of musculoskeletal injuries such as sprains or strains, nor is the use of topical diclofenac to treat musculoskeletal injuries an accepted "off-label" use.

136.    Moreover, some clinical studies of topical NSAIDs have shown them to be no more effective than placebo for treating acute pain (e.g., pain from strains, sprains, contusions, or overuse injuries) in superficial locations.

137.    The FDA requires that diclofenac sodium prescriptions contain a "Black Box Warning" indicating serious cardiovascular and gastrointestinal risks.

138.    A "Black Box Warning" warning is the strictest warning attached to the labeling of a prescription drug or product by the FDA and is designed to call attention to serious or life-threatening risks associated with the drug or product.

139.    Specifically, with every diclofenac sodium prescription, the FDA requires the patient be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular thrombotic events, myocardial infarction, and stroke, which can be fatal; and (ii) diclofenac sodium may cause an increased risk of serious gastrointestinal adverse events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

140.     Notwithstanding the most common uses for Diclofenac Gel 3%, or the risks associated with the drug, the Defendants steered the Prescribers to prescribe Diclofenac Gel 3% while at times recommending the patient continue the use of oral NSAIDs – such as Ibuprofen and Naproxen – or simultaneously prescribing oral NSAIDs and other Fraudulent Topical Pain Products.

141.     Prescribing topical diclofenac, while simultaneously prescribing and dispensing oral NSAIDS to patients, is therapeutic duplication which results in increased risk of adverse events with no additional therapeutic benefit.

142.     In the instant matter, by engaging in such therapeutic duplication, the Prescribers, Clinic Controllers, and Defendants put patients at increased risk of serious cardiovascular and gastrointestinal events (without any additional therapeutic benefit) as the use of oral NSAIDs increases the "Black Box Warning" risks associated with topical diclofenac sodium.

143.     Diclofenac Gel 3% was prescribed pursuant to collusive arrangements and predetermined treatment protocols, and without regard for patient care and safety, or the commercial availability of a wide range of FDA-approved medications, as well as over-the-counter medications, proven to have therapeutic effects and available at a fraction of the cost.

144.     In keeping with the fact Diclofenac Gel 3% was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care and safety, the initial examination reports prepared by the Prescribers virtually never stated the medical basis for the prescriptions and, in some cases, failed to acknowledge that the patient was even being prescribed Diclofenac Gel 3%.

145.     Moreover, the Prescribers' follow-up examination reports virtually never addressed whether the Diclofenac Gel 3% prescribed provided any pain relief to the patient or was otherwise

effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

146.    Defendants' egregious billing coupled with the fact that the Prescribers failed to properly document – or even document at all – the prescriptions for Lidocaine 5% Ointment, Lidocaine 5% Patches and Diclofenac Gel 3%, or the Insureds' use of these medications, further indicates that there was no legitimate medical reason for the Prescribers to have prescribed large volumes of these medications to the Insureds, or for the Defendants to have dispensed such large volumes to the Insureds, particularly given the potential for adverse health effects.

147.    There is no legitimate medical reason for the Prescribers to prescribe excessive amounts of Fraudulent Pharmaceuticals to Insureds, including large volumes of the Fraudulent Topical Pain Products, particularly given the availability of over-the-counter medications, and the legal requirements placed on pharmacists to conduct a prospective drug review before each prescription is dispensed. Such review shall include screening for potential drug therapy problems due to contraindications based on patient comorbidities, therapeutic drug duplication, drug-drug interactions, duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

148.    Clearly, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, were prescribed pursuant to collusive arrangements and predetermined treatment protocols without regard for patient care and safety, or the commercial availability of a wide range of FDA-approved medications with proven therapeutic effects available over-the-counter at a fraction of the cost.

### D.    The Fraudulent Vimovo Products

149.    As further part of the Defendants' fraudulent scheme and illegal collusive arrangements, the Defendants steered the Prescribers and Clinic Controllers to prescribe excessive

amounts of Vimovo Products to Insureds, which further inflated their fraudulent billing submitted to GEICO.

150.    Vimovo is a multi-ingredient oral medication containing naproxen, a nonsteroidal anti-inflammatory drug, and esomeprazole, a proton-pump inhibitor ("PPI"). The naproxen contained in Vimovo is intended to relieve pain and inflammation, while esomeprazole is intended to decrease the risk of developing stomach ulcers.

151.    Vimovo is only FDA approved to treat symptoms relating to osteoarthritis, rheumatoid arthritis and ankylosing spondylitis in patients, and to decrease the risk of developing NSAID-related gastric ulcers.  However, the FDA indicates that Vimovo should not be used as the first course of treatment for acute pain.

152.    Moreover, the American College of Gastroenterology has published guidelines that indicate certain risk factors that puts patients at an increased risk of NSAID-related gastrointestinal injuries, thereby necessitating a PPI like esomeprazole. For example, a patient's prior medical history of complicated ulcers or patients over the age of 65 years old are at increased risk for NSAID-related injury.

153.    Despite the FDA approved indications for the prescription and use of Vimovo, and widely accepted guidelines relating to the medical necessity of PPIs, the Prescribers prescribed, and the Defendants dispensed excessive amount of Vimovo Products – a combined NSAID and PPI medication – to Insureds with no documented history of arthritis related conditions and/or factors which put patients at moderate to high risk of NSAID-associated gastric ulcers.

154.    Moreover, the Prescribers routinely prescribed the exorbitantly priced Vimovo Products to Insureds despite the fact that most Insureds were only involved in minor fender-bender

type motor vehicle accidents and there are no medical studies supporting the efficacy of these products in treating musculoskeletal pain experienced as a result of a motor vehicle accident.

155.    In order to generate and maximize profits, the Defendants steered the Prescribers and Clinic Controllers to prescribe the exorbitantly-priced Vimovo Products – typically dispensed and billed at $2,149.64 for each prescription – without regard for medical necessity or genuine patient care.

156.    Notably, each of the ingredients contained in Vimovo Products are available over-the counter without a prescription at a fraction of the cost.

157.    In further keeping with the Defendants' fraudulent scheme, the Prescribers often failed to even document in their examination reports that the patient was prescribed Vimovo Products.

158.    Likewise, the follow-up examination reports virtually never addressed whether the Vimovo Products prescribed provided any relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

159.    Nonetheless, in keeping with the Defendants' profit driven fraudulent scheme, the Prescribers and Clinic Controllers issued excessive amounts of medically unnecessary prescriptions for Vimovo Products, in conjunction with other Fraudulent Pharmaceuticals.  For example:

- Insured P.G. was allegedly involved in a motor vehicle accident on May 1, 2022 and subsequently sought treatment with NP Dey of Sinha Medical at a No-Fault Clinic located at 170-04 Henley Road, Jamaica, New York. On October 27, 2022, P.G. underwent a follow-up examination with NP Dey who advised the patient to continue taking Naproxen or alternatively, take Tylenol for pain as needed. On November 17, 2022, AV Chemists dispensed and billed for Vimovo, Aspirin, and First Aid Antibiotic Ointment pursuant to "telephone" prescriptions purportedly issued by Dr. Sinha on November 16, 2022. Notably, Dr. Sinha did not examine P.G. on November 16, 2022 and there is no documentation of the aforementioned pharmaceuticals in examination or surgical reports. Moreover, in light of P.G.'s medical history of hypertension and

cardiac disease, any NSAIDs – such as Diclofenac Gel 3% and Naproxen – should be prescribed with caution especially given the fact that the patient is taking two medications for hypertension with a reported history of cardiac disease. Despite this, there is no documentation that the patient was advised on the use of NSAIDs, in conjunction with medications for hypertension.

- Insured H.G. was allegedly involved in a motor vehicle accident on December 14, 2021, and subsequently treatment with Dr. Adeosun of CitiMed Complete Medical at a No-Fault Clinic located at 14 Mamaroneck Avenue, 2nd Floor, White Plains, New York. On November 10, 2022, H.G. underwent a follow-up examination with Dr. Adeosun who issued prescriptions for Vimovo with 3 refills, as well as Lidocaine 5% Ointment and Cyclobenzaprine with 3 refills each. On December 13, 2022, *more than a month later*, AV Chemists dispensed and billed for Vimovo, Lidocaine 5% Ointment, and Cyclobenzaprine pursuant to prescriptions issued by Dr. Adeosun on November 10, 2022. Notably, Dr. Adeosun did not document any pertinent medical history demonstrating the medical necessity of the Vimovo Products.

- Insured X.L. was allegedly involved in a motor vehicle accident on March 1, 2023, and subsequently sought treatment with Dr. Adeosun of CitiMed Complete Medical at a No-Fault Clinic located at 14 Mamaroneck Avenue, 2nd Floor, White Plains, New York. On March 2, 2023, X.L. underwent an initial examination with Dr. Adeosun who issued prescriptions for Vimovo with 3 refills, as well as Lidocaine 5% Ointment and Cyclobenzaprine with 3 refills for each. On March 9, 2023, AV Chemists dispensed and billed for Vimovo, Lidocaine 5% Ointment, and Cyclobenzaprine pursuant to prescriptions issued by Dr. Adeosun on March 2, 2023. On March 28, 2023, AV Chemists dispensed and billed for refills of Vimovo, Lidocaine 5% Ointment, and Cyclobenzaprine. Notably, Dr. Adeosun did not document any pertinent medical history demonstrating the medical necessity of the Vimovo Products. Moreover, X.L.'s medical history includes hypertension, which is contraindicated with the use of NSAIDs – such as Naproxen (a medicine contained in Vimovo Products).

- Insured S.C. was allegedly involved in a motor vehicle accident on September 2, 2022, and subsequently sought treatment with NP Dey of Sinha Medical at a No-Fault Clinic located at 92-07 Roosevelt Ave, Jackson Heights, New York. On November 1, 2022, S.C. underwent a follow-up examination with NP Dey who did not document the prescription of any pharmaceuticals. On November 17, 2022, AV Chemists dispensed and billed for Vimovo, Aspirin, and First Aid Antibiotic Ointment pursuant to "telephone" prescriptions purportedly issued by Dr. Sinha on November 16, 2022. Notably, Dr. Sinha did not examine S.C. on November 11, 2022 and there is no documentation of the aforementioned pharmaceuticals in examination or surgical reports.

- Insured D.A. was allegedly involved in a motor vehicle accident on April 5, 2023, and subsequently sought treatment with Dr. Adeosun of CitiMed Complete Medical at a No-Fault Clinic located at 14 Mamaroneck Avenue, 2nd Floor, White Plains, New York. On April 12, 2023, D.A. underwent an initial examination with Dr. Adeosun who

issued prescriptions for Vimovo with 3 refills, as well as Lidocaine 5% Ointment and Cyclobenzaprine with 3 refills for each. On April 19, 2023, AV Chemists dispensed and billed for Vimovo, Lidocaine 5% Ointment, and Cyclobenzaprine pursuant to prescriptions issued by Dr. Adeosun on April 13, 2023 – the day *after* the initial examination of D.A. Notably, Dr. Adeosun did not document any pertinent medical history demonstrating the medical necessity of the Vimovo Products.

- Insured L.D. was allegedly involved in a motor vehicle accident on March 5, 2023, and subsequently sought treatment with Dr. Adeosun of CitiMed Complete Medical at a No-Fault Clinic located at 14 Mamaroneck Avenue, 2nd Floor, White Plains, New York. On March 8, 2023, L.D. underwent an initial examination with Dr. Adeosun who issued prescriptions for Vimovo with 3 refills, as well Lidocaine 5% Ointment and Cyclobenzaprine with 3 refills for each. On March 10, 2023, AV Chemists dispensed and billed for Vimovo, Lidocaine 5% Ointment, and Cyclobenzaprine pursuant to prescriptions issued by Dr. Adeosun on March 8, 2023. Notably, Dr. Adeosun did not document any pertinent medical history demonstrating the medical necessity of the Vimovo Products. Moreover, L.D.'s medical history includes hypertension. Despite L.D.'s medical history, Dr. Sinha fails to document any medication that the patient was taking for hypertension, which could make him an unsuitable candidate for the use of NSAIDs – such as Naproxen (a medicine contained in Vimovo Products). Further, there is no documentation that the patient was advised on the use of NSAIDs, in conjunction with any medication for hypertension.

- Insured S.B. was allegedly involved in a motor vehicle accident on March 8, 2023, and subsequently sought treatment with Dr. Adeosun of CitiMed Complete Medical at a No-Fault Clinic located at 14 Mamaroneck Avenue, 2nd Floor, White Plains, New York. On March 15, 2023, S.B. underwent an initial examination with Dr. Adeosun who issued prescriptions for Vimovo with 3 refills, as well as Lidocaine 5% Ointment and Cyclobenzaprine with 3 refills for each. On March 18, 2023, AV Chemists dispensed and billed for Vimovo, Lidocaine 5% Ointment, and Cyclobenzaprine pursuant to prescriptions issued by Dr. Adeosun on March 15, 2023. Notably, Dr. Adeosun did not document any pertinent medical history demonstrating the medical necessity of the Vimovo Products.

- Insured J.S. was allegedly involved in a motor vehicle accident on December 15, 2022 and subsequently sought treatment with NP Dey of Sinha Medical at a No-Fault Clinic located at 1647 Macombs Rd, Bronx, New York. On April 10, 2023, AV Chemists dispensed and billed for Vimovo, Aspirin, and Triple Antibiotic Ointment pursuant to "telephone" prescriptions purportedly issued by Dr. Sinha on April 10, 2023. Notably, Dr. Sinha did not examine J.S. on or about April 10, 2023 and there is no documentation of the aforementioned pharmaceuticals in the surgical report.

160.    To date, the Defendants have submitted more than $1.7 million in claims to GEICO through AV Chemists seeking reimbursement for the Vimovo Products.

E.    **The Exploiting of Patients for Financial Gain Through the Illegal, Collusive Arrangements Among the Defendants, Prescribers and Clinic Controllers**

161.    To effectuate the fraudulent scheme, the Defendants steered the Prescribers and Clinic Controllers to routinely prescribe and direct prescriptions to AV Chemists for large volumes of the specifically targeted Fraudulent Pharmaceuticals (i.e., the Fraudulent Topical Pain Products and Vimovo Products) pursuant to their collusive arrangements, which egregiously inflated the charges submitted to GEICO.

162.    New York's statutory framework provides, among other things, that pharmacies and licensed medication professionals are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

163.    Here, the Defendants colluded with Prescribers and Clinic Controllers associated with various No-Fault Clinics, which treat thousands of Insureds, to have the Prescribers prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products and Vimovo Products, and then have those prescriptions directed to AV Chemists so that the Defendants could bill GEICO huge sums.

164.    In furtherance of the scheme, the Prescribers intentionally prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics pursuant to collusive arrangements and fraudulent predetermined protocols, and without regard to genuine patient care, without regard to cost and attention to fiscal responsibility, and often without regard to pharmacologic outcomes.

165. The Prescribers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of No-Fault Clinics, while the Defendants dispensed, or purported to dispense the Fraudulent Pharmaceuticals, despite their knowledge that they were involved in illegal, collusive arrangements designed to exploit the patients for financial gain; the Fraudulent Pharmaceuticals were often being prescribed without regard to pharmacologic outcomes; the Fraudulent Pharmaceuticals were often being prescribed with gross indifference to patient health, care and safety; the Fraudulent Topical Pain Products and Vimovo Products were prescribed as a matter of course without any recommendation that patients first try OTC products; and that the Fraudulent Pharmaceuticals were prescribed without attention to cost and fiscal responsibility, given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost.

166. The Defendants, in collusion with the Prescribers and Clinic Controllers, ensured that the prescriptions for the Fraudulent Pharmaceuticals were directed to AV Chemists notwithstanding that (i) in most instances the No-Fault Clinics and the patients themselves were located in counties far from AV Chemists and (ii) there were countless other pharmacies located much closer to the No-Fault Clinics and the patients.

167. After having the prescriptions steered to AV Chemists, the Defendants purported to deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes, or alternatively, the Insureds were given the Fraudulent Pharmaceuticals dispensed by AV Chemists directly from the front desk staff at the various No-Fault Clinics.

168. The Defendants, Prescribers, and Clinic Controllers virtually never gave the Insureds the option to identify a pharmacy of their choosing to ensure that the prescriptions were

filled by AV Chemists, and to ensure that the Defendants benefitted financially from the prescriptions.

169.    The Prescribers had no legitimate medical reason to prescribe, and AV Chemists had no legitimate reason to dispense, the Fraudulent Pharmaceuticals in large quantities to their patients.

170.    The Prescribers and Clinic Controllers had no legitimate reason to direct the prescriptions for the Fraudulent Pharmaceuticals to AV Chemists rather than to a multitude of other pharmacies that were equally capable of dispensing the prescriptions and often more convenient to many of the patients.

171.    The Defendants, Prescribers, and Clinic Controllers would not have engaged in the illegal, collusive arrangements in violation of New York law, including intentionally prescribing the Fraudulent Pharmaceuticals, and directing those prescriptions to AV Chemists, unless they profited from their participation in the illegal scheme.

172.    But for the payments of kickbacks or other financial incentives from the Defendants, the Prescribers would not have prescribed the Fraudulent Topical Pain Products and Vimovo Products, or the volume of other Fraudulent Pharmaceuticals, and the Prescribers and Clinic Controllers would not have directed the prescriptions to AV Chemists.

173.    The Defendants, Prescribers, and Clinic Controllers affirmatively concealed the particular amounts paid in kickbacks for steering the prescriptions to AV Chemists since such kickbacks are in violation of New York law.

174.    Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, the Defendants paid a financial kickback or provided other financial incentives, and the Prescribers and Clinic Controllers received a financial kickback or other financial incentives,

for each of the particular prescriptions for the Fraudulent Pharmaceuticals that were dispensed by AV Chemists.

175.    Upon information and belief, the payment of kickbacks or other financial consideration issued by the Defendants was made at or near the time the prescriptions were issued.

## IV.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

176.    Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged. Each NDC number has an assigned Average Wholesale Price ("AWP").

177.    Each NDC (and, thus, the AWP) for a particular drug product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained.  The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

178.    Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee Schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

179.    For each generic drug (or ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

180.    The Defendants intentionally targeted the Fraudulent Topical Pain Products and Vimovo Products, with extremely expensive "average wholesale prices," in order to inflate the billing submitted through AV Chemists and to maximize their profits.

181.    In support of its charges, AV Chemists typically submitted: (i) a HCFA 1500 Form which included the purported NDC numbers, units, and corresponding charges for each drug product; (ii) a copy of the Prescribers' prescriptions; (iii) an itemized pharmacy form, which includes the patient's name, the prescribed pharmaceutical, the purported NDC numbers and corresponding charges for each drug product, and the prescribing provider; (iv) a delivery receipt or delivery tracking form; and (v) an assignment of benefit form assigning the Insureds' benefits to the Defendants.

182.    The NDC numbers listed on the HCFA 1500 Forms submitted by the Defendants through AV Chemists are what identified the purported AWPs for each of the Fraudulent Pharmaceuticals.

183.    The Defendants never actually paid the targeted and egregious "average wholesale price" of the Fraudulent Topical Pain Products and Vimovo Products that they dispensed, or purported to dispense, because it is not a true representation of actual market price and is far above the actual acquisition cost for the Fraudulent Topical Pain Products and Vimovo Products.

184.    The Defendants paid only a fraction of the "average wholesale price" of the Fraudulent Topical Pain Products and Vimovo Products that the Defendants targeted to use in connection with the billing submitted through AV Chemists, but nevertheless billed GEICO and other No-Fault insurers egregious amounts far surpassing the cost of an array of other FDA approved, proven effective medications or commercially available over-the-counter products.

## V.     The Defendants' Submission of Fraudulent HCFA-1500 Forms to GEICO

185.    To support the fraudulent charges, statutorily prescribed claim forms for No-Fault

Benefits have been submitted to GEICO by and on behalf of AV Chemists seeking payment for

the pharmaceuticals for which AV Chemists is ineligible to receive payment.

186.    These forms, including HCFA-1500 forms and other supporting records that the

Defendants submitted or caused to be submitted to GEICO, are false and misleading in the

following material respects:

     i.    The HCFA-1500 forms and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care. In fact, the Fraudulent Pharmaceuticals were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit patients for financial gain, without regard for genuine patient care;

    ii.    The HCFA-1500 forms and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to AV Chemists in exchange for unlawful kickbacks and other financial incentives;

   iii.    The HCFA-1500 forms and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Defendants did not comply with all material licensing requirements in that the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products and Vimovo Products) that AV Chemists dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals in order to inflate the charges to GEICO; and

   iv.    The HCFA-1500 forms and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact,

the Defendants did not comply with all material licensing requirements in that they dispensed the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and duplicitous prescriptions.

## VI.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

187.    The Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for those products.

188.    To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Defendants have gone to great lengths to systematically conceal their fraud.

189.    Specifically, the Defendants knowingly have misrepresented and concealed facts in an effort to prevent discovery that (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; and (ii) the Defendants were involved in collusive kickback arrangements with the Prescribers and Clinic Controllers designed to generate voluminous prescriptions solely to maximize the billing to GEICO and other New York insurance companies.

190.    The billing and supporting documentation submitted by the Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, does not reveal its fraudulent nature.

191.    The Defendants have hired law firms to pursue collection from GEICO and other insurers of the fraudulent charges submitted through AV Chemists. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full. In fact, the Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that AV Chemists has been engaged in fraud.

192.     The Defendants' collection efforts through numerous, separate no-fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme since the Defendants know it is impractical for a no-fault arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

193.     GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially-valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of approximately $596,037.92 representing payments made by GEICO based upon the fraudulent charges submitted by the Defendants, which damages are to be trebled under 18 U.S.C. § 1962(c)), et al. to $1,788,113.76.

194.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### THE FIRST CLAIM FOR RELIEF
**Against All Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

195.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

196.     There is an actual case in controversy between GEICO and the Defendants regarding approximately $5,238,992.00 in fraudulent billing for the Fraudulent Pharmaceuticals that the Defendants submitted or caused to be submitted to GEICO through AV Chemists.

197.    AV Chemists has no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because AV Chemists billed for pharmaceutical products that were medically unnecessary and/or prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care.

198.    AV Chemists has no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribers and Clinic Controllers to direct prescriptions for the Fraudulent Pharmaceuticals to AV Chemists in exchange for unlawful kickbacks and other financial incentives.

199.    AV Chemists has no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products and Vimovo Products) that AV Chemists dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

200.    AV Chemists has no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals dispensed by AV Chemists pursuant to illegal, invalid, duplicitous, and/or unauthorized prescriptions.

201.    The Defendants, including AV Chemists, violated New York State regulatory and licensing requirements, rendering the pharmacy ineligible to receive reimbursement for No-Fault Benefits.

202.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Defendants have no right to receive payment for any pending bills for the Fraudulent Pharmaceuticals submitted to GEICO through AV Chemists.

## THE SECOND CLAIM FOR RELIEF
### Against Nektalov, Dolsky and the John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

203.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

204.    AV Chemists is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

205.    Nektalov, Dolsky and the John Doe Defendants knowingly conducted and/or participated, directly or indirectly, in the conduct of AV Chemists' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail and interstate wires to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over four years, seeking payments that AV Chemists was not eligible to receive under the No-Fault Laws because: (i) the billed-for pharmaceutical products were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribers and Clinic Controllers to direct prescriptions for the Fraudulent Pharmaceuticals to AV Chemists in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products and Vimovo Products) that that they acquired at low cost and had AV Chemists dispense in large volumes to Insureds at egregious charges, in

place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the billed-for pharmaceutical products were the product of illegal, invalid, duplicitous, and/or unauthorized prescriptions. The fraudulent bills and corresponding mailings/interstate wire transmissions submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

206.    AV Chemists' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud and wire fraud are the regular way in which Nektalov, Dolsky and the John Doe Defendants operated AV Chemists, inasmuch as AV Chemists never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud and wire fraud therefore were essential in order for AV Chemists to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud and wire fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit, or cause to be submitted, fraudulent claims to GEICO, and continue to attempt collection on the fraudulent billing submitted through AV Chemists to the present day.

207.    AV Chemists is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants.  These inherently unlawful acts are taken by AV Chemists in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

208.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $596,037.92 pursuant to the fraudulent bills submitted by the Defendants through AV Chemists.

209.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THE THIRD CLAIM FOR RELIEF
**Against Nektalov, Dolsky and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

210.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

211.    AV Chemists is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

212.    Nektalov, Dolsky and the John Doe Defendants are employed by or associated with the AV Chemists enterprise.

213.    Nektalov, Dolsky and the John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of AV Chemists' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail and interstate wires to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over four years, that AV Chemists was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for pharmaceutical products were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal,

collusive relationships in which the Defendants steered the Prescribers and Clinic Controllers to direct prescriptions for the Fraudulent Pharmaceuticals to AV Chemists in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products and Vimovo Products) that that they acquired at low cost and had AV Chemists dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the billed-for pharmaceutical products were the product of illegal, invalid, duplicitous, and/or unauthorized prescriptions. The fraudulent bills and corresponding mailings/interstate wire transmissions submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

214.    Nektalov, Dolsky and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

215.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $596,037.92 pursuant to the fraudulent bills submitted by the Defendants through AV Chemists.

216.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THE FOURTH CLAIM FOR RELIEF**
**Against AV Chemists, Nektalov, Dolsky and the John Doe Defendants**
**(Common Law Fraud)**

217.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

218.    AV Chemists, Nektalov, Dolsky and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of AV Chemists.

219.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for pharmaceutical products were medically necessary and properly billed when in fact the billed-for pharmaceutical products were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that AV Chemists acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribers and Clinic Controllers to direct prescriptions for the Fraudulent Pharmaceuticals to AV Chemists in exchange for unlawful kickbacks and other financial incentives; (iii) in every claim, the representation that AV Chemists acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products and Vimovo Products) that that they acquired at low cost and had AV Chemists dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain,

in violation of law; and (iv) in every claim, the representation that AV Chemists acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for pharmaceutical products were the product of illegal, invalid, duplicitous, and unauthorized prescriptions, rendering the pharmacy ineligible for reimbursement for No-Fault benefits.

220.    The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through AV Chemists that were not compensable under the No-Fault Laws.

221.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $596,037.92 pursuant to the fraudulent bills submitted by the Defendants through AV Chemists.

222.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

223.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THE FIFTH CLAIM FOR RELIEF
### Against AV Chemists, Nektalov, Dolsky and the John Doe Defendants
### (Unjust Enrichment)

224.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

225.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

226.     When GEICO paid the bills and charges submitted by or on behalf of AV Chemists for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

227.     The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

228.     The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

229.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $596,037.92.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.     On the First Claim for Relief against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that AV Chemists has no right to receive payment for any pending bills, amounting to approximately $5,238,992.00 submitted to GEICO;

B.     On the Second Claim For Relief against Nektalov, Dolsky and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $596,037.92, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C.     On the Third Claim For Relief against Nektalov, Dolsky and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but

approximately $596,037.92, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

D.      On the Fourth Claim for Relief against AV Chemists, Nektalov, Dolsky and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $596,037.92, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

E.      On the Fifth Claim for Relief against AV Chemists, Nektalov, Dolsky and the John Doe Defendants, a recovery in favor of GEICO in an amount to be determined at trial but approximately $596,037.92 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated: Uniondale, New York
       July 23, 2024

                              RIVKIN RADLER LLP

                              By:   /s/ *Michael A. Sirignano*

                                   Michael A. Sirignano
                                   Barry I. Levy
                                   Jennifer Abreu
                              926 RXR Plaza
                              Uniondale, New York 11556
                              (516) 357-3000

                              *Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*